FILED WITH THE
COURT SECURITY OFFI
CSO:
DATE: 8/3/10

~~SECRET - CLASSIFIED~~

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| SABRY MOHAMMAD EBRAHIM AL-QURASHI (ISN 570), | ) ) ) |
| Petitioner, | ) ) |
| v. | ) ) Civil Action No. 05-2385 (ESH) |
| BARACK OBAMA, *et al.*, | ) ) |
| Respondents. | ) ) ) |

## MEMORANDUM OPINION AND ORDER

Petitioner Sabry Mohammad Ebrahim al-Qurashi, a citizen of Yemen, was arrested in Karachi, Pakistan by Pakistani authorities on February 7, 2002. Several weeks later, he was taken into U.S. custody, assigned internment serial number ("ISN") 570, and transferred first to Kandahar, Afghanistan and then to the naval base detention facility at Guantanamo Bay, Cuba ("Guantanamo"), where he has been held since May 2002. Al-Qurashi has filed a petition for a writ of *habeas corpus,* contending that he is unlawfully detained. Respondents, who include President Barack Obama and other high-level government officials, argue that al-Qurashi is lawfully detained.[1] They have filed a statement of the material facts upon which they intend to rely in making their case-in-chief for the lawfulness of al-Qurashi's continued detention ("Resps.' SMF"), which rests in large part on reports that summarize petitioner's statements to U.S. interrogators in Karachi, Pakistan; Kandahar, Afghanistan; and Guantanamo that he attended the al-Farouq military training camp in Afghanistan.

---

~~SECRET – CLASSIFIED~~

Before the Court is al-Qurashi's motion to suppress on the grounds that these statements were involuntary and procured through coercion and torture. ("Pet.'s Mot.") As narrowed by prior rulings, the sole factual question before the Court at this time is whether petitioner was abused by the Pakistani authorities after his arrest in Karachi on February 7, 2002, but before his interrogation the next day by Special Agent ██████████ of the Federal Bureau of Investigation ("FBI") Joint Terrorism Task Force ("JTTF"), who was the first U.S. official to question petitioner. On January 19 and 20, February 25, and March 25, 2010, the Court heard argument on the motion, received documentary evidence, and heard live in-court testimony from Agent ████████ (*See generally* Hr'g Tr., Jan. 19-20, 2010 ("Jan. Tr."); Hr'g Tr. Vol. 1, Feb. 25, 2010 ("Feb. AM Tr."); Hr'g Tr. Vol. 2, Feb. 25, 2010 ("Feb. PM Tr."); Hr'g Tr., Mar. 25, 2010 ("Mar. Tr.").) Having considered the entire record, the parties' briefs, and their oral arguments, and for the reasons discussed herein, the Court will deny petitioner's motion.

## BACKGROUND

According to a declaration that al-Qurashi submitted with his traverse on November 17, 2009,[2] he was raised in Saudi Arabia by Yemeni parents, he is a Yemeni citizen, and he is a permanent legal resident of Saudi Arabia. (Pet. Ex. ("PEX")[3] 1 ("Pet. Decl.") ¶ 1.) Petitioner asserts that after leaving middle school, he performed a number of jobs, including selling food and perfume in Saudi Arabia and Yemen. (*Id.*) It is undisputed that on or about September █

---

[2] Pursuant to the case management order governing this case, petitioners must file "a traverse containing the relevant facts and evidence supporting the petition." Case Management Order as Amended ("CMO") § I.G, *In re Guantanamo Bay Litig.*, No. 08-MC-442 (D.D.C. Nov. 6 & Dec. 16, 2008).

[3] Petitioner's exhibits were submitted with his traverse and as part of his motion to suppress.

2

SECRET — CLASSIFIED

2000, he flew from Yemen to Pakistan's southern port city of Karachi ██████████████ ██████████████████████ where he checked into a hotel and met a fellow Arab named Abd al-Wahid,[4] who suggested that they travel to Afghanistan together. (Pet.'s Traverse ("Traverse") at 3-4 ¶¶ 4-5; Resps.' SMF ¶ 3.) It is also undisputed that shortly thereafter, petitioner and Abd al-Wahid traveled to Afghanistan, where petitioner remained until late 2001 or early 2002, at which time he returned to Karachi. (*See* Pet. Decl. ¶¶ 1, 6-7, 14; Resps.' SMF ¶¶ 3, 21-22.)

## I. PETITIONER'S DETENTION IN PAKISTAN – FEBRUARY 7-██, 2002

### A. Arrest – February 7, 2002



██████████████ (*See* Resps.' Ex. ("REX")[6] 137██████Feb. 20, 2002 Electronic Communication ("██████EC")) at 2-3 (██████████████████); REX 21 at 4 ¶ 6(A) (noting petitioner's comment that he was "captured at night"); *see also* Feb. AM Tr. at 122 ██████ "I'm sure it was dark out when they did it.").) ██████████████████ ████████████████████████████ (*See* Feb. AM Tr. at 20, 29, 34, 125.)

---

[4] The record contains various spellings for this individual's name, including "Abdul Wahid" and "Abdul Wahad."

██████████████████████████████████████

[6] Respondents' exhibits were submitted with their statement of material facts, with their opposition to the instant motion, and pursuant to various discovery orders.

SECRET – CLASSIFIED

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

Two of the men arrested with petitioner were Pakistani nationals who went by the names

████████████████████████ (*see* ██████ EC at 58-63), but they do not appear to have

been transferred to American custody. The other fourteen arrestees were, like petitioner, later

transferred to American custody and assigned ISN numbers. Public sources indicate that five of

these men have been transferred to their home countries, while the other nine, listed below,

remain in custody and have filed *habeas* petitions in this Court:

- Jalal Salim bin Amer ("Bin Amer") (ISN 564), a Yemeni petitioner in No. 04-CV-1194 (Hogan, J.);

- Abdul Hakim Abdul Rahman Abduaziz al-Mousa (ISN 565), who was transferred to Saudi Arabia in 2007;

- Mansour Mohammed Ali al-Qattaa (ISN 566), a Yemeni petitioner in No. 08-CV-1233 (Huvelle, J.);

- Adel Zamel Abd al-Mahsen al-Zamel (ISN 568), who was transferred to Kuwait in 2005;

- Suhail Abdu Anam (ISN 569), a Yemeni petitioner in No. 04-CV-1194 (Hogan, J.)

- Saad Madi Saad al-Azmi (ISN 571), who was transferred to Kuwait in 2005;

- Saleh Mohammed Seleh al-Thabbii (ISN 572), a Saudi petitioner in No. 05-CV-2104 (Walton, J.);

- Rustam Arkhmyarov (*aka* Rustam Ahmadov Sulih Yanovic) (ISN 573), who was transferred to Russia in 2004;

- Hamoud Abdullah Hamoud Hassan al-Wady (ISN 574), a Yemeni petitioner in No. 08-CV-1237 (Urbina, J.);

4

~~SECRET – CLASSIFIED~~

- Sa'ad Masir Mukbl al-Azani (ISN 575), a Yemeni petitioner in No. 08-CV-2019 (Walton, J.);

- Zahir Omar Khamis bin Hamdoun (ISN 576), a Yemeni petitioner in No. 05-CV-280 (Kessler, J.);

- Abdulaziz al-Swidhi (ISN 578), Yemeni petitioner in No. 04-CV-1194 (Hogan, J.);

- Richard Belmar (ISN 817), who was transferred to the United Kingdom in 2005; and

- Sharqawi Abdu Ali Al-Hajj (ISN 1457), a Yemeni petitioner in No. 09-CV-745 (Lamberth, C.J.).

(*See generally id.* at 3-58.) *See also* The New York Times – The Guantanamo Docket, *at*

http://projects.nytimes.com/guantanamo (last visited Aug. 2, 2010).

### B. Alleged Coercion of Petitioner by the Pakistani Authorities – February 7-8, 2002

Al-Qurashi alleges that the following events occurred after his arrest in the early morning

hours of February 7, 2002, all of which are disputed by respondents:

After his arrest, the Pakistani authorities took petitioner and the sixteen other men to a

"jail" in Karachi. (Pet. Decl. ¶ 17.) At some point, petitioner's wrists and ankles were bound

with rope that "cut[] into his skin." (PEX 2 ("2nd Bhargava Decl.") ¶ 4(j) (relating allegations

communicated by petitioner); *see also* PEX 2A ¶ 2 (petitioner's affirmation of truth of

information in PEX 2 ¶¶ 2-4).) Pakistani interrogators told petitioner that he would be turned

over to the Americans, who "would never believe that [he] had traveled to Pakistan and

Afghanistan for peaceful purposes." (Pet. Decl. ¶ 18.) They also told him that he had to admit to

one of three things: (1) being a member of al-Qaeda, (2) going to Afghanistan to fight for the

Taliban, or (3) going to a military training camp. (*Id.*) Although petitioner "told them

repeatedly that none of these things was true," they told him that "if [he] admitted to one of these

5

SECRET – CLASSIFIED

three things, [he] would not be tortured and [he] would be handed over to [his] country," but if

he did not admit to any of these things, "the Americans would torture [him] until he confessed."

(*Id.*)

Petitioner "could hear people being tortured in surrounding cells," and "[o]n bathroom

breaks, [he] witnessed other people being tortured when [he] was escorted through the hallways

and glanced into other cells." (Pet. Decl. ¶ 19.) For example, he saw Anam (ISN 569) "pinned

face-first against a wall, hanging by his hands" (*id.* ¶ 20), and also heard the screams of others

"through the cell walls," including screams from someone whom he believed to be Bin Amer

(ISN 564), who "looked like he had been beaten up" when petitioner saw him after Bin Amer's

interrogation sessions. (*Id.* ¶ 21.)

Petitioner persisted in asserting his innocence. (*See* Pet. Decl. ¶ 23.) One of the

interrogators then "threw an ashtray at [him], hitting [him] in the chest"; after this, one

interrogator "restrained [him] from behind while another slammed [his] head into the table," and

they also "repeatedly punched [him] in the stomach." (*Id.*) Petitioner refused to confess, so the

interrogators "threw [him] on the floor and continued to beat [him]," with one of them "put[ting]

his knee on [petitioner's] head and threaten[ing] to administer electroshocks or worse if [he] did

not confess." (*Id.* ¶ 24.) Because petitioner still refused to confess, the interrogators "forced

[him] to kneel facing a wall and told [him] not to move." (*Id.* ¶ 25.) At this point, all but one of

the interrogators left the room, with the remaining interrogator forcing petitioner to stay kneeling

"for a long time" and striking him with a cane if he moved. (*Id.*)

"Later," the interrogators told him that "if [he] did not pick one of the three options, they

would accuse [him] of all three." (Pet. Decl. ¶ 26.) When he refused to pick, "[t]hey tied a black

6

~~SECRET~~ ~~CLASSIFIED~~

bag over [his] head." "tied [his] hands and feet behind [him]," and then "beat [him] severely, including hitting [his] head," causing him to "thr[o]w up blood and los[e] consciousness." (*Id.*) Upon waking up, petitioner was thrown onto the floor and lost consciousness again. (*Id.* ¶ 27.) The next thing he remembers is "being forced down some stairs where the interrogators removed the hood and ropes" and being told to "wash in a sink," because he "was covered in blood." (*Id.*)

Next, "[t]wo new interrogators" told al-Qurashi that they had spoken to the Yemeni embassy and that he could return to Yemen if he spoke to the Americans. (Pet Decl. ¶ 28.) He was told that the Americans "did not care if people said they went to training camps," so long as they "did not join al-Qaeda." (*Id.*) The interrogators promised him he "would be freed if [he] confessed to going to" the al-Farouq training camp in Afghanistan, but that he "would be detained and tortured indefinitely if [he] did not." (*Id.* ¶¶ 28-29.) "Because [he] had endured so much abuse already" and "was afraid the Pakistanis and the Americans would continue to torture [him], [he] finally agreed to falsely confess to going to al Farouq." (*Id.* ¶ 29.) In order for petitioner to give the American interrogators "a convincing story" (*id.* ¶ 28), the Pakistani interrogators "showed [him] a thick stack of photographs" of al-Farouq and "gave [him] information about the camp, including the names of its leaders and the process of getting to the camp." (*Id.* ¶ 30.) They then "arranged for the Americans to interrogate [him]" (*id.*), which occurred on the afternoon of February 8, 2002.

### C.    Initial Statement to U.S. Officials



(*See* ▮▮ EC at 1, 3; Feb. AM Tr. at 22-23.)

7

~~SECRET - CLASSIFIED~~



████████████████████████████████████████

███████████████████████████████ (*See* █████ EC at 2; Resps.' Response to

Court's Oral Order of Mar. 25, 2010 at 1 ¶ 1; Feb. AM Tr. at 69.) ████ █████ ██

████████████████████████████████████████
████████████████████████████████████████

████████████████████████████ (Feb. AM Tr. at 21, 61; *see*

*generally* █████ EC.) █████████████████████████████

█████████ (*See* Feb. AM Tr. at 109.)

████ (*See* █████ EC at 22-24; Feb. AM Tr. at 23-24; Feb. PM Tr. at 29; REX 62 ("█

Decl."[7]) ¶ 7; REX 130 at 10 (translator's interview notes).) █████████████████
████████████████████████████████████████

████████ EC at 23), ██████████████████████████

████████████████ (*Id.* at 24.) ████████████████████

████ (*See id.* at 23.) █████████████████████████

████████████████████████████████████████

---

[7] Prior to giving testimony in Court, █████ had also submitted a declaration that accompanied respondents' opposition to the instant motion. The declaration is consistent with his live testimony.

SECRET = CLASSIFIED

(*Id.*) EC,

---

[8] "Kabul," "Logar," "Khost," and "Paktiya" (or "Paktia") are names of Afghan provinces. *See* CIA – The World Factbook – Afghanistan, *at* http://www.cia.gov/library/publications/the-world-factbook/geos/af.html (last visited Aug. 2, 2010) ("Administrative divisions"); *see also* Wikipedia – "Afghanistan," *at* http://en.wikipedia.org/wiki/Provinces_of_Afghanistan (last visited August 2, 2010).

9



(*Id.* at 23-24 (brackets added; parentheses in original).) ■■■■■■■

■■■■■■■ (*Id.* at 22-23.)

## II. PETITIONER'S DETENTION IN AFGHANISTAN – ■■■■■ TO MAY ■ 2002

(■■■ Decl. ¶ 6.) Around ■■■■■ petitioner arrived at an American military base in Kandahar, Afghanistan. (*See* REX 30 (intake form) at 2.) During intake, ■■■■■■■ (*Id.* at 1.) ■■■■■■■

■■■■■■■ (PEX 6; *see* Jan. Tr. at 142-43.) ■■■■■■■

In March 2002, al-Qurashi was interrogated on at least three separate days. (*See* REX 21 (■■■ report); PEX 64 (■■■ report); PEX 65 (■■■ eport).) Like the ■■■ EC, the reports from the first two of these interrogations state that petitioner admitted attending the al-Farouq camp. The third report focuses on petitioner's flight from Afghanistan and his stay at the Karachi safehouse, although it also states that petitioner "is barely functionally literate" and that in the interrogator's opinion, petitioner "is not part of a larger conspiracy." (PEX 65 ¶ 3.)

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET – CLASSIFIED

In addition, al-Qurashi now alleges that while he was in Kandahar, U.S. officials abused

him by, *inter alia*, threatening him with dogs; stripping him naked ████████████

making him lie on his stomach, tying his legs and hands behind him, and then yanking him up by

his hands, "nearly pulling [his] arms from their sockets"; stripping him naked and placing him

outside in the cold; and placing a gun to his head and threatening to shoot him if he did not

"confess to being an important part of al-Qaeda." (Pet. Decl. ¶¶ 31-33.)

## III. PETITIONER'S DETENTION IN GUANTANAMO BAY – ████████ TO PRESENT

Around May █ 2002, al-Qurashi was transferred to Guantanamo and "inprocessed." (*See*

REX 64 (Final Narrative Medical Summary) at 1.)



(*Id.* at 466.)

████████████████████ al-Qurashi was interrogated on at least nine

separate days by officials from various U.S. government entities. (*See* REX 81 (by military

personnel ████████████████ REX 7 (by military ██████████████ █

11

SECRET — CLASSIFIED



PEX 71 (by military personnel ██████; REX 79 (by FBI and military personnel ██████.) The reports from these sessions consistently state that petitioner told his interrogators that he attended al-Farouq, notwithstanding other discrepancies in his reported statements.[9]

On September 11, 2002, al-Qurashi recanted his earlier inculpatory statements and denied that he ever attended al-Farouq, reportedly stating that he originally incriminated himself because the "Pakistani authorities threatened him with torture unless he admitted to attending the training camp at Al Farouq" and that they "promised his release if he said he trained [there]." (PEX 66 (FD-302 of Sept. 13, 2002) at 1-2; *see also* REX 55 (identical intelligence report) at 2 ¶¶ 5-6).) But "now that the Department of Justice [was] interviewing him, he want[ed] to tell the truth . . . ." (PEX 66 at 1-2.)

A week later on September 20, 2002, al-Qurashi reaffirmed that his post-arrest inculpatory statements were false and were the product of coercion, and that "he learned details about the Al Farouq camp from Khalid Dossieri, a Saudi, who was staying at a guest house in Kabul . . . ." (REX 32 at 1.) In all subsequent interrogations, petitioner continued to disavow his initial statements about attending al-Farouq. (*See* REX 110 (statements ██████; REX 113 (same); PEX AA ██████); REX 111 (██████; REX 19 (██████ REX

---

[9] Petitioner also claims in his recent declaration that during these interrogation sessions, he continued to say that he had attended al-Farouq because interrogators promised they would release him if he did not change his story and told them what they wanted to hear, and because they threatened that if he did change his story, they would do "bad things" to him, including placing him in solitary confinement or sending him "somewhere he would never see the sun." (Pet. Decl. ¶¶ 36-37.)

12

SECRET = CLASSIFIED

108 ███████; REX 107 (███████; REX 13 (███████); REX 115 (████

███; REX 116 (███████)[10] He also claims in his recent declaration that in the period

after he recanted, he was abused by officials at Guantanamo. (Pet. Decl. ¶ 41.) For example, he

alleges that he was placed for weeks at a time in a room without furniture, and that the room was

often flooded with freezing cold water, or that its temperature was lowered until it was freezing

cold. (*Id.*) He also alleges that he was placed in a cell where guards threw "concentrated

cleaning products" that made him feel like he was suffocating. (*Id.* ¶ 42.)

On August 3, 2005, al-Qurashi testified at a hearing before the military Administrative

Review Board ("ARB"). (*See* REX 15 (ARB hearing transcript); *see also* REX 42 (ARB hearing

audio recording).) There, he stated that the Pakistani authorities got him to admit that he had

attended al-Farouq because he was afraid they would torture him. (*See id.* at 5-6.)[11]



[10] REX 119 indicates that petitioner was also interrogated █████ ██████████████████████ (*See* REX 119 at 2.) REX 121 also indicates petitioner was interrogated █ ███████████ (REX 121 at 1 ¶ A.) The record does not contain any reports from those days, so there is no record of what petitioner said during those interrogation sessions.

[11] At the ARB hearing, when presented with the charge that he had trained at al-Farouq and had identified "Abu Muhammad al Musri" as the camp's leader, petitioner stated:

> Yes, I said that to the Pakistani interrogators. Not Pakistani interrogators, [but] American interrogators in Pakistan. And what I said [to the American interrogators] was because the Pakistani interrogators wanted me to say that. When [the Pakistani interrogators] arrested me they took me to a building and they divided us. They put me in a room [with] three people in front of me. I was sitting on a chair and next to me was a Pakistani interpreter. They asked me to tell my story. I told them my story about my mission . . . coming to Afghanistan to teach Islamic rule. The Pakistanis told me after I gave them my whole story . . . they told me the American interrogators are going to ask [your story] and they are not going to believe that [have told us]. You [will say] you went for Jihad and to fight for the Taliban. They said they would force me to say this. [I asked them] why [they] were forcing me to say what [they] want me to say? They said

13

SECRET CLASSIFIED

## IV. THE INSTANT LITIGATION[12]

On December 13. 2005. a habeas petition was filed in this Court on behalf of al-Qurashi

and other detainees by counsel from the Center for Constitutional Rights. In February 2009,

petitioner's current counsel, attorneys at the law firm of Winston & Strawn LLP, entered their

appearance. Michael Bhargava, who argued the instant motion for petitioner, traveled to

Guantanamo and met with petitioner for the first time from July 7 through July 9. (*See* REX 59

("1st Bhargava Decl.") ¶ 6.) On July 20, respondents filed their statement of material facts.

Bhargava again met with petitioner at Guantanamo on August 26 and 27. (*Id.*)

On September 9, 2009, al-Qurashi filed a sealed motion to compel respondents to

---

> because the Americans . . . if you don't say what we are saying to you . . . you
> know there are no rules or system to defend you. We will start torturing you until
> you say what we are telling you to say to the [Americans]. [If you do] you will be
> released. They said that has happened with some other Saudi people . . . we have
> arrested some other Saudis and they did what we asked them to do and they left.
> They promised me they would keep their word. I didn't go for jihad and I don't
> know . . . they said just say I went there for military training [and] it would be
> [easier] for me. I told them if I say that, then they are going to ask me who
> trained me and where . . . I need information. They said they would give me
> simple information because our intelligence works with those people in the
> camps. We have information and we can give it to you. I asked them if each of
> them promised and they [all] said yes. They brought some pictures and showed
> them to me and they said if they ask you who is the prince of the camp say Abu
> Muhammad Al Musri. [They also said I need to appear to be telling the truth to
> the Americans.] Also [they said not to] tell the Americans that I have been
> interrogated by [the Pakistani interrogators]. The only thing that made me agree
> with them was that I knew [they had tortured some people with us], and this made
> me nervous. This is my story.

(REX 15 at 5-6 (brackets and ellipses in original).)

[12] The Court is grateful to petitioner's counsel for their *pro bono* representation of
petitioner under extremely difficult conditions. The Court acknowledges their excellent work,
their professionalism, and the tremendous effort that they have made on their client's behalf
throughout these proceedings.

14

SECRET - CLASSIFIED

produce, *inter alia*, evidence that he had been "tortured and otherwise mistreated by this Pakistani and American captors . . . ." (Pet.'s Sealed Mot. to Compel (Dkt. 356) at 1-2)[13] Accompanying that motion was a declaration by Bhargava which summarized the allegations of torture that petitioner had related to counsel during their July and August meetings. (*See generally* 1st Bhargava Decl. ¶ 6.) According to Bhargava, "this was the first time that [petitioner] had the opportunity to discuss what happened with counsel representing him, [so] he provided significant information that he had never before disclosed." (*Id.*) Many of the details alleged by petitioner are repeated in his subsequent November 2009 declaration, discussed above. (*See supra* Section I.B.) According to Bhargava's declaration, petitioner told him that after his arrest, the Pakistanis "detained him for several days," during which he was told to make incriminating statements to the Americans, or else "the Americans would torture him until he confessed." (1st Bhargava Decl. ¶ 6(b).) Petitioner refused to confess, so he was beaten by his captors and made to kneel in a corner "overnight." (*Id.* ¶¶ 6(d)-(e).) "On the next day," he again refused to confess, so he was beaten and soon lost consciousness – only to revive, be beaten again, and lose consciousness once more. (*Id.* ¶ 6(f).) After reviving and washing up, he met with two new Pakistani interrogators who guaranteed his freedom and promised that he would return to Yemen he if spoke to the Americans for a few hours and told them that he had attended al-Farouq. (*Id.* ¶ 6(g).) Having endured "several days of beatings and false assurances," petitioner "relented and agreed to make a false confession." (*Id.*) The interrogators fed him details about al-Farouq, "including the process of traveling to and registering for the camp," and

---

[13] The Court granted the motion to compel in part on October 6, 2009, requiring, *inter alia*, that respondents produce petitioner's statements, any interrogation logs that referenced him, and any medical records or photographs of petitioner that were created before October 1, 2002.

15

~~SECRET - CLASSIFIED~~

then they turned him over to the Americans, after which he was transferred to Kandahar and Guantanamo, where he was further abused. (*See id.* ¶¶ 6(h)-(m).)

On November 25, 2009, al-Qurashi filed his traverse. That same day, respondents moved to stay the proceedings ████████████████████████████████████ On December 9, petitioner moved to suppress his statements prior to his recantation in September 2002 on the ground that they are the product of coercion and torture in Pakistan, Afghanistan, and Guantanamo. The motion to suppress also seeks to exclude other documentary evidence as insufficiently authenticated.

On December 10, 2009, the Court denied the government's motion for a stay. The Court, however, bifurcated the proceedings and limited the upcoming hearing to consideration solely of "the question of petitioner's motion to suppress evidence relating to the government's allegation that petitioner was present at the al-Farouq training camp." (Dec. 10, 2009 Order at 3.) Subsequently, respondents filed their opposition to the instant motion and petitioner filed his reply.

On January 19 and 20, 2010, the Court heard argument on the instant motion to suppress. The hearing was continued until February 25 and March 25, so that the Court could hear testimony from Agent ████ and the parties could submit additional documentary evidence not previously included with their briefs. Throughout these proceedings, petitioner was offered the opportunity to participate via telephone and to testify via video conference. According to his counsel, petitioner elected not to testify or to listen to the proceedings. (*See* Jan. Tr. at 3; Mar. Tr. at 7.)

16

~~SECRET - CLASSIFIED~~

## ANALYSIS

Having reviewed the voluminous documentary evidence introduced by the parties and the declarations and live testimony presented at the hearing, the Court will now proceed to set forth the governing legal standards and will then apply these standards to the facts as found by the Court.

## I. LEGAL STANDARDS RELATING TO CLAIM OF COERCION

Some interrogations can be "so inherently coercive that [their] very existence is irreconcilable with the possession of mental freedom by a lone suspect against whom [the government's] full coercive force is brought to bear." *Ashcraft v. Tennessee*, 322 U.S. 143, 154 (1944). When a criminal suspect is subjected to a coercive interrogation and then confesses or incriminates someone else, courts may properly exclude such inculpatory statements because of their "probable unreliability," *Jackson v. Denno*, 378 U.S. 368, 386 (1964), and the concomitant "'likelihood that the confession is untrue.'" *United States v. Karake*, 443 F. Supp. 2d 8, 51 (D.D.C. 2006) (quoting *Linkletter v. Walker*, 381 U.S. 618, 638 (1965)); *accord Mohammed v. Obama*, No. 05-CV-1347, 2009 WL 4884194, at *23 (D.D.C. Dec. 16, 2009) ("[A]s a practical matter, resort to coercive tactics by an interrogator renders the information less likely to be true."); *see also Rogers v. Richmond*, 365 U.S. 534, 541 (1961) ("To be sure, confessions cruelly extorted may be and have been, to an unascertained extent, found to be untrustworthy."). For this and other reasons, [14] "[a] coerced confession is offensive to basic standards of justice . . .

---

[14] It is also well established that in criminal proceedings, statements of the accused "that are 'extracted by threats or violence' violate the Due Process Clause," *Karake*, 443 F. Supp. 2d at 51 (quoting *Hutto v. Ross*, 429 U.S. 28, 30 (1976)), because such statements are "'[in]consistent with the fundamental principles of liberty and justice which lie at the base of all

17

~~SECRET~~ ~~CLASSIFIED~~

because declarations procured by torture are not premises from which a civilized forum will infer guilt." *Lyons v. Oklahoma*, 322 U.S. 596, 605 (1944).

The same concerns for a statement's reliability are applicable here. "The habeas court must have sufficient authority to conduct a meaningful review of" not only "the Executive's power to detain" but also the underlying "cause for detention." *Boumediene v. Bush*, 128 S. Ct. 2229, 2270 (2008). Accordingly, this Court's power to issue the Great Writ must necessarily encompass the power to reject a statement – whether by a petitioner or by a witness against him – as an invalid basis for detention if it is the unreliable product of coercion. *See, e.g., Bacha v. Obama*, No. 05-CV-2385, 2009 WL 2149949, at *1 (D.D.C. July 17, 2009) (granting as conceded petitioner's motion to suppress post-arrest out-of-court statements as products of torture); *Mohammed*, 2009 WL 4884194, at *27 (excluding witness's statements that incriminated petitioner because those confessions "d[id] not represent reliable evidence to detain Petitioner"); *Alla Ali Bin Ali Ahmed v. Obama*, 613 F. Supp. 2d 51, 58 (D.D.C. 2009) (refusing to credit interrogation statements for witness against petitioner where court could not "infer that past instances of torture did not impact the accuracy of later statements"); *Nargeri v. Obama*, 612 F. Supp. 2d 45, 48 (D.D.C. 2009) (ordering production of "evidence that indicates a statement is unreliable because it is the product of abuse [or] torture").

"The ultimate test" for determining whether a statement was coerced is "the test of

---

our civil and political institutions . . . .'" *Id.* at 50 (quoting *Brown v. Mississippi*, 298 U.S. 278, 286 (1986)). However, it remains uncertain to what extent the Due Process Clause applies to the detainees at Guantanamo Bay. *Cf. Kiyemba v. Obama*, 555 F.3d 1022, 1026 (D.C. Cir. 2009) (stating in *dicta* that "the due process clause does not apply to aliens without property or presence in the sovereign territory of the United States"), *reinstated as amended following vacatur as moot*, 605 F.3d 1046 (D.C. Cir. 2010).

18

SECRET - CLASSIFIED

voluntariness." *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961). This requires the Court to

ask whether "the confession is the product of an essentially free and unconstrained choice by its

maker," or whether "his will has been overborne and his capacity for self-determination [has

been] critically impaired . . . ." *Id.* The answer to this question is determined by considering

"the totality of all of the surrounding circumstances – both the characteristics of the accused and

the details of the interrogation." *Schneckcloth v. Bustamante*, 412 U.S. 218, 226 (1973); *see,*

*e.g., Mohammed*, 2009 WL 4884194, at *23 (determining voluntariness of statements based on

totality of circumstances); *Esmail v. Obama*, No. 04-CV-1254, 2010 WL 1798989, at *3 n.3

(D.D.C. Apr. 18, 2010) (same); *Al-Madhwani v. Obama*, 696 F. Supp. 2d 1, 7 (D.D.C. 2010)

(same). Thus, a court may consider the interrogated party's age, level of education, and

intelligence, as well as physical mistreatment or credible threats thereof, psychological abuse,

and the conditions of confinement. *Schneckcloth*, 412 U.S. at 226; *Arizona v. Fulminante*, 499

U.S. 279, 287 (1991); *Karake*, 443 F. Supp. 2d at 51.

The case management order that governs this case provides that "[t]he government bears

the burden of proving by a preponderance of the evidence that the petitioner's detention is

lawful." CMO § II.A. Consistent with other decisions involving Guantanamo detainees, this

Court will assume that the government must prove the voluntariness of petitioner's statements by

a preponderance of the evidence.[15] *See, e.g., Mohammed*, 2009 WL 4884194, at *23 ("The

---

[15] Respondents argue that "'[i]n a federal habeas action, the burden of proving that the
confession was involuntary rests with the petitioner.'" (Opp'n at 1 (quoting *Boles v. Foltz*, 816
F.2d 1132, 1136 (6th Cir. 1987)). However, this argument is premised upon inapposite case law
that only pertains to *habeas* in the context of collateral attacks upon a prior conviction in a court
of law. *See, e.g., Johnston v. Zerbst*, 304 U.S. 458, 468-69 (1937) ("It must be remembered,
however, that a *judgment* cannot lightly be set aside by collateral attack, even on habeas corpus.

19

~~SECRET~~ ~~CLASSIFIED~~

government bears the burden of showing that the confessions are voluntary."); *Al-Rabiah v. United States*, 658 F. Supp. 2d 11, 36 (D.D.C. 2009) (concluding that "the Court has no basis to find, by a preponderance of the evidence, that the confessions that [the petitioner] repeated in 2004 are reliable and credible"); *Ahmed*, 613 F. Supp. 2d at 58 (declining to infer accuracy of witness's later statements where government did not present evidence "to dispute the [witness's] allegations of torture"); *Al-Madhwani*, 696 F. Supp. 2d at 6-7 (concluding that petitioner's confessions in Afghanistan "were the product of coercion" where government "made no attempt to refute" – and in fact corroborated – petitioner's descriptions of abusive treatment there, and noting that "[t]he burden is on the government to demonstrate that each subsequent confession was not a product of coercion").

## II.   FACTUAL FINDINGS

Although Al-Qurashi does not deny having told his American interrogators that he had attended the al-Farouq training camp, he argues that those statements were the product of coercion. Al-Qurashi contends that upon his arrest, he was "brutally beaten and threatened with worse" by the Pakistani authorities, and that "[u]nder the threat of continued torture and a false promise of relief if he confessed, [he] eventually agreed to tell the Americans that he was at al

---

When collaterally attacked, *the judgment of a court* carries with it a presumption of regularity." (emphases added)). By contrast, al-Qurashi's petition for *habeas* is an attack upon the legality of his extrajudicial detention, and thus, unlike a typical *habeas* petitioner, he never "acuiqesce[d] in a trial resulting in his conviction . . . ." *Id.* at 468; *cf. Boumediene*, 128 S. Ct. at 2269-70 (distinguishing "the postconviction habeas setting" from the habeas context at issue, in part because the safeguards afforded by judicial hearings are "not inherent in executive detention orders or executive review procedures"); *Al-Bihani v. Obama*, 590 F.3d 866, 877 (D.C. Cir. 2010) ("[I]n the shadow of *Boumediene*, courts are neither bound by the procedural limits created for other detention contexts nor obliged to use them as baselines from which any departures must be justified.").

20

SECRET - CLASSIFIED

Farouq." (Mem. in Supp. of Pet.'s Mot. ("Mem.") at 25-26.) He also alleges abuse by U.S. officials in Kandahar and Guantanamo. As a consequence, he argues, the Court should suppress his statements to U.S. interrogators in Karachi, Kandahar, and Guantanamo as involuntary. However, as explained herein, it is unnecessary to determine whether petitioner was in fact mistreated in Kandahar or Guantanamo. (*See also* Mar. Tr. at 4.)

Approximately 36 hours after his arrest in Karachi, al-Qurashi told Agent ███ that he had attended al-Farouq. If this statement is found to have been *voluntary*, the issue of the voluntariness of later statements that he attended al-Farouq would be rendered irrelevant. Conversely, if petitioner's statement to ███ was *involuntary* because the Pakistani authorities abused and threatened him, then any subsequently consistent statements made in Kandahar and Guantanamo could arguably be tainted by that initial torture, regardless of whether he was further mistreated in those other locations. *See Karake*, 443 F. Supp. 2d at 86-87; *Lyons*, 322 U.S. at 603 ("The effect of earlier abuse may be so clear as to forbid any other inference than that it dominated the mind of the accused to such an extent that the later confession is involuntary."). Under either scenario, the Court's focus is appropriately limited to petitioner's allegations of torture while in Pakistani custody just prior to his interrogation by Agent ███ on the afternoon[2] ███ And, in determining the credibility of these allegations as to voluntariness, the Court must engage in "a fact-specific inquiry that depends almost entirely on an assessment of the credibility of the witnesses" to the events of February 7 and 8, 2002, *Karake*, 443 F. Supp. 2d at 54, as well as any reliable documentary evidence. These witnesses are Agent ███ petitioner, and the individuals who were arrested with him.

In performing this task, the Court has considered reams of documentary evidence,

21

SECRET – CLASSIFIED

including interrogators' reports of statements by petitioner and other detainees who were arrested on the same day, declarations by government officials, declarations by other detainees offered in this and other *habeas* actions, and third-party accounts of Pakistani governmental agents' abuse of suspects in custody.[16]  Both parties have also offered opinions of medical experts who have reviewed petitioner's medical records from Guantanamo and the photograph of him in Kandahar. Finally, the Court heard live testimony from Agent ███████.  And, as noted, while petitioner did not testify, the Court considered his November 17, 2009 declaration (PEX 1); his statements to counsel that were relayed through Bhargava's declarations of September 4 and November 25, 2009 (*see* 1st Bhargava Decl.; 2nd Bhargava Decl.), the second of which petitioner declared to be true (*see* PEX 2A); and his post-recantation statements, particularly those from his August 2005 ARB hearing, which were made under oath.  (*See* REX 15 at 1, 5-6.)

For the reasons discussed below, the Court is persuaded that Agent ███████ testimony is to be credited and that this testimony, as elaborated upon herein, in conjunction with other evidence, sustains the government's burden of establishing voluntariness.  The Court also finds, as Judge Kennedy did in *Esmail*, that petitioner's "descriptions of abuse, particularly the ones made to his attorneys shortly before the merits hearing, are exaggerated," *see* 2010 WL 1798989, at *5, and therefore, they cannot be credited.  Finally, the Court finds that the statements of petitioner's fellow arrestees and the other evidence before the Court do not undercut the government's evidence of voluntariness.  Thus, the Court must reject petitioner's claim that his

22

SECRET - CLASSIFIED

statements to Agent ███████ were the involuntary product of torture by his Pakistani captors, and

it will therefore deny petitioner's motion to suppress.

**A.    Agent** ███████ **Testimony**

**1.    Interview with petitioner**



████ (Feb. AM Tr. at 8-9.) ██████████████████

██████████████████ (*id.* at 36), ████ ██████████

██████████████████████████

██████████████████ (*Id.* at 16; ████

Decl. ¶ 2.)

████ ████████████ (*See* Feb. AM Tr. at 18; Feb. PM Tr. at 3.)

██████████████████████ ████ ██ – ████

██████████████████████

██████████ (*See* Feb. AM Tr. at 75, 123-24, 129-30.) ████

████████████████████

██████████ (*Id.* at 75.) ██████████████ ██

████ ██████████████ ████████████

████ (*Id.* at 75, 123.)

████ ██████████████████

(Feb. PM Tr. at 29.) ██████████████████

██████████████ ████████████

23

SECRET – CLASSIFIED



██████████ ████████████████████████ ███████

████████████████████████████████████████████

██████████████ (*Id.* at 32.)[17] ████████████████████

████████████ ████████████████ ██████████████████ (Feb. AM

Tr. at 23, 76; *see* █████EC at 41-45.) Agent █████ was present and took notes. ████████

████████████████████████ (Feb. AM Tr. at 23, 76; Feb. PM Tr. at 31.) ████████

████████████████████████████████████████████ (*See*

██████EC at 41; Feb. PM Tr. at 29.)

█████ ████████████████████████████████████████[18] (Feb.

AM Tr. at 28; Feb. PM Tr. at 4.) ████████████████████████████

████████ ██ ██████████████████ ████████████████████

█████ ████████████████████████████████████████

17 2 ███████ 2

████ took handwritten notes during these sessions. (*See* REX 122-128, 131.)

~~SECRET - CLASSIFIED~~



███████████ (Feb. AM Tr. at 44-45.) ████████████████████████████

████████ |████████████ 2 ████████████| *Id.* at 22, 53.)

███████████████████████████████████ (Feb. AM Tr. at 44.)

████████████████████████████████████████

███████████████████████████████ (*Id.* at 52, 59-61.) ██████

████████████████████████████████████████

(*Id.* at 45-47, 55.) █████ ████████████████████████████

████████████████████████████████████████

████████████████ |███████████████████

████████████████████████████████████████

████████ (*Id.* at 54-56, 60.) ██████████████████████ (*Id.*

at 60.) █████████ |███████████████████████████ (*See*

Feb. PM Tr. at 30.)

█████████████████ |███████████████████

████████████████████████████████████████

███████████████████████████████████ (Feb.

AM Tr. at 77-78; *see also id.* at 96-97 ████████████████

████████████████████████ , the translator████████████

████████████ took notes. (*See* REX 124 █████ interview notes); REX 130 at 10-11

(translator's notes)███████████████████████████████

~~SECRET - CLASSIFIED~~



(Feb. PM Tr. at 29-30.)

(Feb. AM Tr. at 33, 47-48; Feb. PM Tr. at 5.)

(Feb. AM Tr. at 47),

(*Id.* at 34.)

(*Id.* at 16, 69.) (*Id.* at 8.)

## 2. ▮▮▮ testimony is credible and reliable

Based on Agent ▮▮▮ demeanor and the substance of his testimony, the Court finds him to be a credible and reliable witness who had the incentive and opportunity to observe whether al-Qurashi manifested any evidence of having been tortured in the ▮▮▮

First ▮▮▮ was required to ▮▮▮ Feb. AM Tr. at 34),

___

[19] ▮▮▮ notes are largely consistent with his EC, and both materials record petitioner's statement that he attended al-Farouq. Although there are several discrepancies between ▮▮▮ notes and his EC, the two documents are consistent with respect to petitioner's statement that he received training at al-Farouq.

26

~~SECRET - CLASSIFIED~~



(*Id.* at 37.)

(Feb. AM Tr. at 37.)

(*Id.*)

(*Id.* at 37-38.)

(*Id.* at 38.) As

(*Id.*)

(Feb. PM Tr. at 7)

(Feb. AM Tr. at 38.)

Second, the record shows that ▮▮▮ acted in conformity with his instructions to vigilantly report signs of mistreatment. Although most arrestees did not bare any visible signs of injuries "that warranted being noted in [his] notes" (Feb. PM Tr. at 7), there were two exceptions. ▮▮▮▮▮▮

(Feb. AM Tr. at 93-94; *see* ▮▮▮ EC at 9.) ▮▮▮▮▮▮

EC at 35; Feb. AM Tr. at 94-95.)

Third, although ▮▮▮ saw no visible signs of abuse on al-Qurashi, he had ample

27

~~SECRET - CLASSIFIED~~

opportunity to observe petitioner and his demeanor. For about two hours, he and al-Qurashi sat only a few feet across from each other at a coffee table. During this time, ███ ████

████████████████████████████████████████████████████████

████████████ (*See, e.g.,* Feb. AM Tr. at 44-45, 52, 55.) ████████

████████████████████████████████████████████████████████

████████████ (*Id.* at 45, 52, 59-60.) ████████

████████ (*see id.* at 60-61). ████████████████████████

████████████████████████████████████████████████████████

████████████ (*See* ████ EC at 22-24; REX 124 ████ interview notes) at 3-7.)

Fourth, ████ had a clear memory of his interview with al-Qurashi. He testified to very specific details about the compound, ████████████████████████████ the particular room in which he conducted interviews, down to its tile floor; what he wore during the interview; what petitioner wore and the path he took in walking to a seat next to the translator;

████████████████████████████████████████████████████████

████████████████████████████ ████ also had reason to remember petitioner in particular. He testified, ████████████████████ ████████

████████████████████████████ So ████████ ████

████████████, ████████████████ and the interview commenced with the assistance of the translator." (*Id.* at 53.) ████████████████ ████

████████████████████████████ (*See* Feb. PM Tr. at 28-29.) It is also reasonable to conclude that al-Qurashi's interview was memorable and distinct from that of ████ because unlike ████ petitioner did not speak English, so this was the first arrestee

28

SECRET - CLASSIFIED

interview where ██████ required an interpreter.[20] (See Feb. AM Tr. at 25.) ██████ further testified that petitioner's interview was distinctive ██████████████████████████ ████████████████████████████████████ (Id. at 53.)

Finally, ██████ medical training and related experiences also help to corroborate the reliability of his observations. From 1969 through 1973, ██████ served in Vietnam with the U.S. Navy as a hospital corpsman. (See Feb. AM Tr. at 8, 10, 13.) His training included patient care, emergency care, and aviation medicine, as well as Survival, Evasion, Resistance, and Escape ("SERE") training, during which he was subjected to abusive interrogations, simulated drowning, and overnight stress positions. (See id. at 10-13.) While serving in Vietnam, ██████ helped perform physicals, treated wounded soldiers, and treated local civilians during trips to their villages. (See id. at 13-14.) After his discharge, ██████ became the evening manager of a 300-bed civilian hospital and saw injured people "[e]very day." (Id. at 14-15.) This history makes it particularly likely that ██████ was able to accurately observe the physical and mental conditions of the arrestees whom he interviewed.

### 3. Petitioner's arguments for not crediting ██████

Although petitioner's counsel has candidly acknowledged that Agent ██████ was "conducting his job in good faith" (Mar. Tr. at 53), he nonetheless argues that ██████

---

[20] The clarity of ██████ memory is further demonstrated by his testimony that ██████ ██████████████████████████████████████ ██████████████████████████████ (Feb. PM Tr. at 22.) This testimony is corroborated by allegations in ██████ civil suit (see PEX X ¶ 132), as well as a 2005 British newspaper report that quotes an unnamed senior U.S. official as saying, "'██████ was insistent he had not been involved in any fighting, and when we asked if he would be willing to assist us in the war against terror, I thought he might be willing to try.'" David Rose, Beatings, sex abuse and torture: how MI5 left me to rot in US jail, The Observer, Feb. 27, 2005, at 11, available at http://www.guardian.co.uk/politics/2005/feb/27/guantanamo.usa (last visited Aug. 2, 2010).

29

SECRET - CLASSIFIED

testimony is not reliable because█████ could not have remembered how petitioner looked eight years ago, especially given the brevity of their encounter and the stressful conditions under which █████ and his colleagues were working. (See id. at 43, 53.) The Court disagrees. As noted, █████ has demonstrated a vivid memory of many details of the interrogation. Not only did he give a detailed account of its circumstances, but he explained that he specifically remembered his interview of petitioner due to the novelty of the situation and because of petitioner's defiant attitude – unique among the arrestees – in refusing to be interviewed[2]█████

[2]█████ in the room.

Petitioner further argues that even if█████ testimony were reliable, it is not relevant because█████ acknowledged that he had no personal knowledge of petitioner's pre-interview detention, that he did not inquire into petitioner's treatment in Pakistani custody, and that he did not conduct an examination looking for injuries. (See, e.g., Mar. Tr. at 44-45, 54.) Petitioner argues that based on these facts and the decision in *Uthman v. Obama*, No. 04-CV-1254, 2010 WL 1626073 (D.D.C. Apr. 21, 2010) (Kennedy, J.), where two detainees' statements were found to be involuntary despite a government interviewer's testimony that █ observed no signs of torture.[21]█████ testimony cannot establish anything meaningful about the circumstances of

---

[21] In *Uthman*, the Court granted the detainee's *habeas* petition after discounting, as products of torture, incriminating statements about Uthman that two other detainees had made to a military investigator at the U.S. detention facility in Bagram, Afghanistan. Both detainees (one of whom was al-Hajj (ISN 1457)) alleged that they had been physically tortured while in American custody. *See* 2010 WL 1626073, at *4. The investigator testified in court that█ did not observe "any signs of abuse in the demeanor or physical state of either man[] while █ was with them." *Id.* However,█ testimony did not "effectively rebut the evidence of abuse," because █ had "no knowledge of the circumstances of either detainee's confinement before his arrival at Bagram and █ had] quite limited knowledge of his treatment there. . . . The investigator did not see [them] other than during █ four-hour [interrogation] sessions and did

30

SECRET—CLASSIFIED

petitioner's confinement prior to the interview. (*See* Mar. Tr. at 55-56.)

Again, the Court disagrees. Based on the timeline established by al-Qurashi's recent claims, it could only have been a matter of *hours* between the end of petitioner's alleged abuse and the moment when he came to be sitting three feet from███████ (Pet. Decl. ¶¶ 27-30; *see also* 1st Bhargava Decl. ¶¶ 6(f)-(h) (Pakistanis purportedly tortured and then fed al-Farouq details to petitioner after he was kept in stress position "overnight").) First, there had to be a lapse of time between petitioner's arrest, transport, and processing by Pakistani and American officials (including Agent███) and any opportunity for abuse. Thereafter, according to petitioner, he was subjected to various forms of mistreatment that caused unspecified injuries to his throat (*see* 2nd Bhargava Decl. ¶ 4(k)), and which culminated in his captors inflicting repeated blows to his head, both before a bag was placed over it and afterward. (*See* Pet. Decl. ¶¶ 23, 26.) Common sense dictates that these beatings, as described by petitioner, would have left *some* form of marks upon the head, neck, or face, whether in the form of abrasions, bruises, swelling, or simply redness. (*See* Mar. Tr. at 49.) Petitioner also affirmed that he told his counsel that the rope that was used to bind his wrists "cut[] into his skin." (2nd Bhargava Decl. ¶ 4(j); PEX 2A (petitioner's affirmation).) Moreover, petitioner claims that he was forced to remain kneeling against a wall for a long time, and that he was then twice beaten to the point of being rendered unconscious. Yet███ observed no injuries, nor did his EC record any, and petitioner did not exhibit any difficulty walking, talking, or thinking clearly.[22]███ could not

---

not inquire of them, or anyone else, about their treatment in the various prisons in which they were held." *Id.*

[22] Petitioner's allegations of being beaten so badly that he vomited blood appear to be similarly contradicted by███testimony. Although petitioner's head was purportedly tied

31

SECRET – CLASSIFIED

have made these observations if petitioner endured the mistreatment he now claims,[23] including

being tied with rope that cut into his skin. (*Compare* REX 124 at 3-7 ████████ interview notes

for petitioner, making no mention of injuries), *with* REX 128 at 1 ████████ interview notes for

████████████████████████████.) *Uthman* is therefore distinguishable, as that

case does not appear to have involved (1) a compressed timeline between abuse and

interrogation, (2) specific allegations of mistreatment that left (or were highly likely to leave)

marks that should have been visible to any observer, and (3) an interrogator who was under

specific orders to observe and report any evidence of abuse.

In sum, contrary to petitioner's argument, ████ provides significant and credible

evidence regarding the circumstances of petitioner's detention.

████████ testimony about petitioner's demeanor during the interview further suggests that

al-Qurashi was speaking voluntarily. He refused to cooperate in front of Agent ████, which

suggests that his will had not been overborne, *cf. Culombe*, 367 U.S. at 602, as does his ████████

████████████████████████████████████████████████████

EC at 23.) Even if petitioner's reluctance to be interviewed ████████████████ was

genuinely motivated by cultural belief, his overall attitude of defiance suggests that he was not

---

in a bag when he threw up blood, he was later told to wash himself because he "was covered in
blood" (Pet. Decl. ¶ 27), which suggests that the bag had not fully contained the blood. Yet
████████████████████████████████ (Feb. AM Tr. at 57, 60.)
Petitioner does not allege that the Pakistanis gave him clean clothes to wear, and ████████
testimony indicates that the Pakistanis did not give the arrestees new clothes as a matter of
course, because at least some of the arrestees "were in their street attire." (*Id.* at 46.)

23 ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████

32

SECRET—CLASSIFIED

"speaking out of fear." *Esmail*, 2010 WL 1798989, at *9 (finding that veracity of severe torture allegations were undermined by interrogation report stating that detainee refused to further cooperate with interrogators, in part "'due to religious reasons'").

In addition, ▮▮▮▮ testimony and handwritten interview notes establish that petitioner spoke with specificity about his travels in Afghanistan. This significantly undercuts petitioner's claim that he was simply repeating a false narrative that he had memorized *shortly after being twice beaten into unconsciousness.* Such brutal treatment would make it difficult to memorize a fictional account of one's travels so that it could be retold persuasively as the truth. Ye▮▮▮▮ testified that the interview's tone was "conversational" and "easygoing." (Feb. AM Tr. at 53.) The fluency of petitioner's answers is also reflected in ▮▮▮▮ handwritten notes. These notes present a relatively linear narrative, suggesting that petitioner provided a coherent chronological account of his time in Afghanistan. (*See* REX 124 at 3-6.) Petitioner described how he got to al-Farouq, the training he received, the names of the people in charge at the camp, the size of the training groups, and where he traveled after he left.[24] There is no credible evidence that any

---

[24] ▮▮▮▮ also noted that al-Qurashi said he "filled out [an] app[lication] upon arr[iving]" at al-Farouq, in which he "stated [that he] wanted to train for 1 month[.]" (REX 124 at 5.) Respondents contend that the veracity of this statement is corroborated by a purported al-Qaeda training manual and a training camp application. (*See* REX 72 (original manual in Arabic); REX 29 (manual translated into English); REX 132 (original training camp application in Arabic); REX 133 (application translated into English).) However, the Court is unable to conclude with any confidence that either of these documents refers to petitioner.

First, both documents reference an applicant named "Abu Yaqub," and respondents contend that this person is petitioner. (*See* Resps.' SMF ¶ 10.) However, petitioner denies ever using the name "Abu Yaqub," although he concedes that he used the name "Yaqub" during his travels, without the honorific "Abu." (Pet. Decl. ¶ 45.) Second, the manual states that Abu Yaqub hails from "Al-Jazira (Al Hafr)" (REX 29 at 52), and the application states that he comes from al-Hadhar, Saudi Arabia (REX 133 at 3), but neither of these locations appears to correspond to petitioner's statements to interrogators that he has lived in al-Hodaida, Yemen

33

~~SECRET – CLASSIFIED~~

parts of petitioner's statement to ████ were prompted by information fed to him during the

interview itself.[25] Moreover, both parties' counsel acknowledge that the Pakistani authorities

would have been speaking in Urdu, while petitioner speaks only Arabic. (*See* Mar. Tr. at 16-17,

45-46.) Petitioner's declarations do not state that the Pakistanis had a translator on hand, so it is

unclear how they communicated such intricate details as the fact that city, jungle, and mountain

training was available at al-Farouq. (*See* REX 124 at 5.) But even assuming that they employed

---

(REX 124 at 1) and Hafr al-Batin, Saudi Arabia. (REX 80 at 3; *see* Jan. Tr. at 26 (clarifying
location name).) Third, Abu Yaqub signed the application on "14/6/22" (*see* REX 133 at 2), and
respondents argue that "14" actually refers to the Islamic calendar year 1421 (even though the
"21" is not on the page), and that if read in this way, the date converts to late September 2000 in
the Gregorian calendar, which is roughly when petitioner traveled to Afghanistan. (Mar. Tr. at
89-93.) Petitioner disputes this reading of the date on the document and offers an expert
declaration to refute respondents' interpretation. (*Id.* at 81; *see* PEX 79 (Bigelow Decl.) ¶ 6).)
Fourth, the application states that at the time he signed it, Abu Yaqub had already attended the
al-Farouq, Khaldan, and "Drotna" (probably "Derunta," *see* REX 3) camps (*see* REX 133 at 6),
but the government has never alleged that petitioner attended three training camps in
Afghanistan *before* he arrived there in late September 2000. Fifth, the application contains a
phone number (*see id.* at 3 (████████████)) which, respondents argue, resembles one that
petitioner allegedly provided during an interrogation at Guantanamo. (REX 80 (████████Decl.)
at 1 ¶ 4; *see id.* at 3 (interrogator's notation: "TP: ████████").) Petitioner declares that he does
not recognize the phone number in REX 133 and that it does not "describe[]" him. (Pet. Decl. ¶
45 (reviewing different exhibit with same phone number).)

    Ultimately, the Court need not determine the probative value of these documents in order
to resolve the instant motion, given the Court's conclusion that the government has sustained its
burden of proof regarding petitioner's statement to Agent ████

[25] ████████████████████████████████████████████

(*See* Feb. AM Tr. at 76-78, 96-97.) In addition, ████████ ████████████████

████████(*See* Feb. AM Tr. at 124-30.)████

████████Notably, however, petitioner does not allege that he told ████ ██
████ "what they wanted to hear," although he does allege this about later American
interrogations. (*Compare* Pet. Decl. ¶ 31, *with id.* ¶¶ 36-37, 43.)

34

SECRET—CLASSIFIED

a translator, the time-intensive process of translation would have served merely to further reduce the amount of time available to convey such details.

Al-Qurashi's stated reason for leaving the camp also bolsters the veracity of the account he gave to Agent █████████ ████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████ (REX 124 at 4.) The U.S.S. Cole was bombed in Yemen on October 12, 2000, almost four weeks after petitioner's arrival in Pakistan. This is roughly consistent with the fact that petitioner told ████ he was at al-Farouq for "[one] month." (*Id.*) Despite the detail of petitioner's declarations and those of his counsel, none of these documents suggests that the Pakistanis specifically fed petitioner details about *why* he left the camp or that they tailored such a reason to the particular circumstances of his travels. (*See* REX 15 at 6 (testifying at ARB testimony that Pakistanis promised to give him "simple information" and citing only pictures and name of camp's leader); 1st Bhargava Decl. ¶ 6(h) (relating petitioner's allegation that he was told about "the process of traveling to and registering for the camp").) So even if petitioner did not cite the Cole by name, the specificity of his reference to its bombing and the camp attendees' fear of a retaliatory strike suggests that his statement about when he left al-Farouq was truthful.

## B.  Petitioner's Claims of Abuse Are Not Credible

### 1.  Timeline inconsistencies

Petitioner himself has cast doubt on the credibility of his allegations because he appears to have changed his story in material respects between the time he spoke to his counsel in July and August 2009 and when he signed his declaration in November 2009, after key government

35

SECRET - CLASSIFIED

evidence had been obtained.

As an initial matter, it is reasonable to conclude, as ███████ testified, that after the

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████ (*See* Feb. AM Tr. 25-26.) Thus, even assuming that petitioner was arrested

at sometime before dawn on February 7, 2002, it would likely have been several hours before he

had arrived at the facility where he was allegedly coerced. Accordingly, the Court focuses not

on the 36-hour time period between his arrest and interrogation by Agent ██████, but on a

slightly shorter period of time beginning with his placement in a detention facility sometime

during the late morning of February 7.

Within this approximately 30-hour period, petitioner's allegations of abuse fall into five

discrete episodes. First, he was tied up in ropes and told to confess to being a member of al-

Qaeda, fighting for the Taliban, or training a military camp, or else the Americans would torture

him. (Pet. Decl. ¶ 18; 2nd Bhargava Decl. ¶ 4(j).) During this time, he could hear torture in the

surrounding jail cells, and when he was given the opportunity to take bathroom breaks, he

observed torture of his fellow arrestees. (Pet. Decl. ¶¶ 19-22.) Second, his interrogators grew

tired of his refusal to confess and began to beat him mercilessly. (*Id.* ¶¶ 23-25.) Third, he was

made to kneel facing a corner "for a long time." (*Id.* ¶ 25.) Fourth, he was beaten again, to the

point of losing consciousness twice in a row. (*Id.* ¶¶ 26-27.) Fifth, under further pressure from

new interrogators, he agreed to confess, and the interrogators then gave him specific information

to memorize about al-Farouq. (*Id.* ¶¶ 26-30.)

While it may not be impossible for these five episodes to have occurred over the 30-odd

36

SECRET—CLASSIFIED——

hours between al-Qurashi's detention by the Pakistanis and his interview by ███████ petitioner

has not always adhered to this timeline. Petitioner told counsel in July and August 2009 that the

Pakistanis had detained him "for several days," and that he had endured "several days of beatings

and false assurances" by the time he agreed to falsely incriminate himself. (1st Bhargava Decl.

¶¶ 6(b), 6(g).) Petitioner also stated that he had been forced to stay awake "overnight" while

kneeling against a wall until "the next day." (*Id.* ¶¶ 6(e)-(f).) But on October 1, 2009, the

government produced declassified evidence showing that petitioner's arrest and ███████

interview occurred only one calendar day apart. (*See* REX 48 at 1.) Subsequently, on November

17, 2009, petitioner authored a declaration in which he replaced counsel's prior references to

"several days" with less time-specific phrases (*see, e.g.*, Pet. Decl. ¶ 29 (attributing confession to

fact that he "had endured so much abuse already")), and stated that he was forced to kneel

merely "for a long time." (*Id.* ¶ 25; *see also* 2nd Bhargava Decl. ¶ 4(i) ("for hours on end").)

Thus, in a space of several months, petitioner had shied away from his "several days" timeline

and revised the length of the kneeling episode. These inconsistencies further discredit

petitioner's account.

## 2.    Absence of definitive medical evidence

Al-Qurashi's credibility is also undermined by the fact that under either version of his

timeline, the alleged beatings that led to him blacking out twice – and to his subsequent

confession and education about al-Farouq – could only have occurred over the course of several

hours on February 8, 2002, directly before he met Agent ███████ Given the absence of any

corroborating medical evidence, these allegations are, at best, exaggerated. *Cf. Esmail*, 2010 WL

1798989, at *9 ("The [petitioner's medical] records apparently contain no evidence of the

37

SECRET // CLASSIFIED

repeated beatings to which [he] asserts he was subjected, calling into serious question the

truthfulness of [his] most serious allegations of torture."). This is not to say that claims of torture

*must* be accompanied by permanent bodily damage such as the "visible scars" in *Karake*. *See*

443 F. Supp. 2d at 16-17, 56 (defendant was left with "visible scars" from alleged abuse with

barbed wire and prolonged handcuffing of his wrists to his ankles). But where, as here, the

torture alleged includes repeated blows to the head that led to vomiting of blood and repeated

losses of consciousness, it is reasonable to expect that at least some physical effects would have

been manifested on the day of the abuse, even if they did not leave more permanent evidence.

But ███ observed nothing noteworthy.

---

[26] Each party also submitted a declaration from a physician ███ shortly after arriving in Kandahar. (*See* PEX 9 ███ Decl."); REX 77 ███ Decl.").) ███ Decl. ███ Decl. ███.)

Both physicians also reviewed medical records from petitioner's time in Guantanamo, as well as other documents filed in this case, and they are familiar with his allegations of mistreatment. (*See* ███ Decl. ███ Decl. ███ They opined extensively on whether the Guantanamo medical records reflect symptoms or injuries attributable to petitioner's alleged mistreatment. Nonetheless, the Court finds that the medical records are inconclusive with respect to petitioner's specific allegations of mistreatment on February 7 and 8, 2002. (*See,*

~~SECRET = CLASSIFIED~~

### 3. Petitioner's stated reasons for recanting are not credible

The Court is also highly skeptical of al-Qurashi's stated reasons for recanting. He

explained that he recanted in September 2002 because the interrogators told him "they were with

the Department of Justice," and "[b]ecause they said they were about 'justice,'" he believed that

he "finally had a chance to tell the truth." (Pet. Decl. ¶ 38.) Yet, by even his own standards, he

did not tell them the whole truth. Rather, he told them only that the Pakistanis had *threatened* to

torture him, as opposed to actually torturing him. He professes that this was because he had been

told the Pakistanis "still had access to Guantanamo," so he was "afraid that if [he] told [the

Americans] what the Pakistanis did to [him], the Pakistanis would prevent [him] from going

home." (*Id.* ¶ 39.) Instead of telling the DOJ officials "the truth of what the Pakistanis did to

[him], [he] *made up a story* about learning information about al Farouq from someone [he] called

Khalid Dossieri." (*Id.* (emphasis added); *see* REX 32 at 1.) By now suggesting that Dossieri

was merely a fabricated story, however, petitioner contradicts his earlier sworn testimony to the

ARB, where he maintained that Dossieri was a real person whom he met at a guesthouse in

Kabul, and from whom he learned of al-Farouq's existence but nothing more.[27]



*See also* Jan. Tr. at 303-04.)

[27] At the ARB hearing, petitioner disavowed his prior statement of September 20, 2002 (REX 32 at 1) that he had discussed "details" about al-Farouq with Dossieri, testifying as follows:

39

~~SECRET—CLASSIFIED~~

Additionally, the government's evidence supports a more plausible inference that al-Qurashi changed his story in September 2002 not because of the presence of DOJ interrogators, but because he was unhappy with how Guantanamo interrogators were treating him. Once ███████████████████████ at Guantanamo at the end of May 2002, he was interrogated regularly. Through May and June, he consistently told his interrogators that Abd al-Wahid (and others) had duped him into going to al-Farouq. (*See* REX 81 (May 28-30 and June 1-2, 2002); REX 7 (May 29, May 31, and June 2-4, 2002); ███████████████ REX 8 (June 27, 2002); PEX 71 (June 27, 2002); *see also* PEX 64 (Mar. 2, 2002 report from Kandahar: al-Wahid "convinced him to go to Afghanistan to a camp for a month to do *aidid*, study the Koran, and teach the Koran").) Following petitioner's interrogation[2] ████████ a military interrogator wrote that al-Qurashi "stated he was a member of the Jamaat Tablighe" who "end[ed] up" at al-Farouq but did not complete the training program. (PEX 71 at 1 ¶ 1(C).) Although petitioner was "sincere and cooperative," the interrogator felt that "his story ha[d] all the traits of a cover story." (*Id.* at 2 ¶ 4(A).) The interrogator concluded that petitioner needed to "realize the dangers of lying to us," so he recommended that the "fear up" approach be used during petitioner's next interrogation. (*Id.* at 1 ¶ 1(C).) The record contains no direct evidence that the "fear up"

---

[A]bout the details, there was not a conversation with him. Because I was in that house and he was there[,] I asked him where he was from. Of course he did not tell me, but he said he was at al-Farouq camp. This information . . . that was the first time I heard about al-Farouq camp was from this guy and the Pakistanis. That is the only information I know. When I asked him his name and where he was from he said his name was Khalid Dossieri and he was from Saudi Arabia. That is all I know about [that] gentleman. I even forgot what he looks like. I met him for seconds and didn't see him anymore.

(REX 15 at 8 (ellipsis in original).)

SECRET = CLASSIFIED

technique was ever employed. However, it is reasonable to infer that the "fear up" technique

was indeed used ████████████████████████████ interrogation by FBI and

NCIS personnel. At that ████ session, petitioner

> advised that he did not wish to continue providing information to investigators. According to [him], he has decided not to further cooperate because during his last interview, *uniformed interrogators were disrespectful towards him and called him a liar.*

> [He] explained that in an earlier interview, he told investigators about a house that he had stayed at in Afghanistan. According to [him], when asked if he saw explosive belts stored there[,] [he] advised that after he told the investigators that he did not see any such items, *they became angry and began yelling at him.*

(REX 79 at 1 (emphases added).) "After much discussion" with the FBI and NCIS interrogators,

petitioner "decided to answer questions as long as he was treated with what he termed respect,"

and stated, *inter alia,* that Abd al-Wahid "convinced him to travel to Afghanistan for business"

but then "abandoned" him at al-Farouq. (*Id.*) A month later ████████ interrogators

advised al-Qurashi "of the importance of his continued cooperation." (PEX 66 at 1.) He

responded that "he ha[d] experienced continued interviews and promises while being

incarcerated," "questioned why he ha[d] been treated like a criminal.███████████████

████████████████ After answering some questions about his flight from Afghanistan

to the Karachi safehouse, petitioner then "stated that all information about his travel to

Afghanistan in previous interviews with U.S. authorities was coerced and fabricated." (*Id.*)

From this, it is fair to infer that petitioner recanted his story because he was tired of the

interviews and objected, perhaps with good reason, to his treatment at Guantanamo.

41

~~SECRET = CLASSIFIED~~

### 4. Petitioner's current claims of abuse are inconsistent with his prior post-recantation statements

It is also telling that al-Qurashi's description of what happened to him while in Pakistani custody changed dramatically between his 2005 ARB testimony and what appears to be his first meetings with counsel in the summer of 2009. Petitioner's November 2009 declaration makes detailed allegations about how the Pakistani authorities beat him into submission just before his interview with ███ (*See supra* Background, Section I.B.) However, with one exception, none of his post-recantation interrogation statements alleges that he was beaten. *See* PEX 66 (Sept. 11, 2002: "threatened him with torture"); REX 55 (same); REX 32 (Sept. 20, 2002: "threatened with torture"); REX 110 (Oct. 3, 2002: "he was instructed to say he attended"); REX 113 (same); REX 111 (2 ███████: "forced him"); REX 19 (2 ███████ "forced him"); REX 107 (2 ███████: "told him and others to say that they were at" al-Farouq so they could obtain expedited release from U.S. custody); REX 13 (Dec. 6, 2003: "he would probably be tortured by the Americans"); REX 116 (Nov. 3, 2004: "he had seen and heard several men get tortured by the Pakistanis," and he was "a weak minded person when he was held by the Pakistanis"). The Court recognizes that these reports are not testimony but are hearsay, in that they are "summaries of interrogations [that] should not be equated with verbatim recitations" of what petitioner said during those interrogations. *Mingazov v. Obama*, No. 05-CV-2479, 2010 WL 2398883, at *3 (D.D.C. May 13, 2010). Nonetheless, the consistency of these reports is highly significant. The sole exception is a December 23, 2002 report that mentions physical abuse in passing, stating that petitioner "claimed he was beaten until he decided it was in his best interests to pick one" of the three incriminating statements that the Pakistanis were urging him to

42

~~SECRET~~ ~~CLASSIFIED~~

repeat to the Americans. (PEX AA at 1.) But not even this report provides any specificity about the alleged beating, and it certainly provides no details of abuse that might corroborate the particular allegations of petitioner's November 2009 declaration.

Al-Qurashi's August 3, 2005 sworn testimony before the ARB is similarly devoid of any claim that he was tortured.[28] At the ARB hearing, petitioner testified that the Pakistanis threatened him with torture and gave him false promises of repatriation. (*See* REX 15 at 5-6.) Most importantly, he testified that *"[t]he only thing* that made [him] agree" to say he attended al-Farouq was his anxiety over the fact that he knew they had tortured other arrestees. (*See id.* at 6 (emphasis added).) As respondents rightly observe, the fact that petitioner was already willing to discuss his Pakistani captors' alleged *threats* of torture makes it all the more conspicuous that he did not claim *actual* torture. (*See* Opp'n at 12.)

Petitioner's consistent failure to allege physical mistreatment by his Pakistani captors – especially with the detail he now provides – raises a strong inference that his present allegations are, at best, "embellished . . . in an effort to create an advantage for himself in this litigation." *Esmail*, 2010 WL 1798989, at *9 (concluding that it was reasonable to draw adverse inference from "late addition" of "serious allegations" of abuse that were not made in an earlier declaration which also claimed abuse). For this reason, the Court concludes that petitioner's allegations regarding his treatment by the Pakistanis following the February 7, 2002 raid are not credible.

**C.    Petitioner's Other Evidence Does Not Undermine Respondents' Showing**

    **1.    Statements by petitioner's fellow arrestees**

Statements by three of the men arrested with al-Qurashi indicate that they were not

---

[28] *See supra* note 11.

SECRET – CLASSIFIED

tortured by the Pakistanis. The attorney for Hamdoun (ISN 576) has declared that although

Hamdoun said he was threatened with torture, he himself "was not tortured by the Pakistanis."

(PEX 15 ¶ 8.)[29] On one occasion, Hamdoun himself was even reported as saying that his

Pakistani captors treated him "very well." (REX 95 at 1.) Al-Hajj (ISN 1457) – the purported

al-Qaeda facilitator who ran the safehouse – has stated in two declarations that he was tortured

extensively after being transferred to U.S. custody and rendered to certain foreign countries, yet

these declarations never allege torture by the Pakistanis. (See PEX 23 at 1 ¶ 1; PEX 80 ¶ 3

(same).)[30] Similarly, after his 2005 release, al-Zamel (ISN 568) declared on another detainee's

behalf that he received "brutal" treatment while in U.S. custody in Afghanistan, yet he described

his detention in Pakistan without any reference to mistreatment. (See PEX 16 ¶¶ 6-7.)

Statements by other arrestees ostensibly corroborate al-Qurashi's allegations of physical

abuse in Karachi. However, not only is it implausible that the Pakistani authorities would have

brutally abused some arrestees and not others (i.e., Hamdoun, al-Hajj, and al-Zamel), but many

of these other arrestees' statements are not reliable or relevant. For example, al-Qattaa (ISN

566) stated in a declaration submitted on al-Qurashi's behalf that

---

[29] This is corroborated by the fact that Hamdoun recanted his incriminating statements by explaining that the Pakistani authorities "told him if he would admit to Jihad, he would be taken to a 'nice American prison' instead of a 'bad Arab prison' where he would be tortured." (PEX 74 ¶ 3.) However, Hamdoun told his attorney that another arrestee told him that he had been tortured, and that "it was commonplace for the Pakistanis to beat up detainees." (PEX 15 ¶ 8.)

[30]



EC at 5.) Based on the                    EC,

(See id. at 10.) Although this statement favors petitioner, it does little to undercut the government's evidence.

~~SECRET - CLASSIFIED~~

> I saw him in a Pakistani prison when I was at that prison in 2002, after we had been imprisoned for several days. He came to us and there were marks of beating and exhaustion and fatigue upon him. I asked him what had happened to him but he would not tell me because he was extremely exhausted. On the next day, I asked him again, and he told me that he had been beaten and had been asked to say certain things but I don't know what they were exactly. I tried to [persuade] him and I told him that it would only be a few days until he could leave according to what the Pakistanis had promised us.

(PEX 14 at 2 (brackets in original).) This statement does not provide credible corroboration for petitioner's account of torture. First, it is inferable that the "marks" that al-Qattaa claims to have seen were inflicted *after* petitioner's interrogation by Agent ███ since al-Qattaa saw petitioner "several days" after they were imprisoned. Second, ██████████ almost three years after the raid, al-Qattaa was shown a photo of petitioner during an interrogation session and stated that "he did not recognize" petitioner, and that "he could not recall anytime he had met him in or out of the camp [*i.e.*, Guantanamo]." (REX 129 at 1.)[31] Because al-Qattaa could not remember ever meeting petitioner when asked almost *three* years after the raid, it is not credible that he would now remember, almost *eight* years after the raid, that he did in fact meet petitioner in 2002, how petitioner looked at the time, and the substance of their conversation.

Belmar (ISN 817) also submitted a declaration on petitioner's behalf. (*See* PEX W.) It states that during his interrogations by the Pakistanis, they "regularly beat [him] on [his] shins and feet with a stick that resembled a cricket bat" whenever they believed he was lying, and they told [him] that [he] would be sent to Jordan or Syria to be tortured" and "wanted [him] to admit

---

[31] This is consistent with petitioner's own statements to interrogators ██████ (*See* REX 114.) At that time, petitioner said he recognized the name "Mansour" (al-Qattaa's first name) as someone who was also at the safehouse, but he did not recognize al-Qattaa when interrogators showed him a picture; petitioner explained that this was because he was only at the house for a limited time and did not have the opportunity to become acquainted with the 15 people staying there. (*Id.* at 1 ¶¶ 2-3.)

~~SECRET = CLASSIFIED~~

that [he] was part of al Qaeda[,] which was not true." (*Id.* ¶ 5.) This statement is generally

consistent with the claims he is now making in a civil suit filed in the United Kingdom (*see* PEX

X ¶ 130), which itself may serve to create an inference of bias, thereby casting doubt on his

credibility. But more importantly, even if Belmar's statement is true, it is of limited probative

value with respect to petitioner's allegations. The physical abuse that Belmar describes is

limited to being beaten on the feet. ███████████████████████ ██████████████

████████████████ It is reasonable to conclude, as Belmar did,

that such beatings were designed to avoid leaving "obvious marks to a casual observer." (PEX

W ¶ 7.) By contrast, petitioner's alleged torture went far beyond such beatings, including

repeated blows to his head and ropes that cut into his wrists, which are far more likely to leave

visible marks.[32]

Al-Qurashi also declared that he observed three of his fellow arrestees being tortured or

bearing the marks of torture. Anam (ISN 569) was allegedly tortured by the Pakistanis, "pinned

face-first against a wall, hanging by his hands." (Pet. Decl. ¶ 20.) In 2005, interrogators

reported that Anam said that he had made false statements to his Pakistani interrogators

"due to 'torture.'" (*See* REX 90; PEX 75.) If true, this would corroborate what petitioner saw

and, in turn, petitioner's allegations. However, Anam's 2005 statement is undermined by his

---

[32] Belmar also declared that he was first interrogated, while shackled, by ███ Americans "in a large room with couches," and that "the Americans were armed with pistols in holsters." (PEX W ¶ 6.) ████████ █ ████████████████████████████ (Feb. AM. Tr. at 111), ██████████████████████ (*See* Feb. PM Tr. at 31.) ███████████ ███ (*See* Feb. AM Tr. at 79-80, 112.) The Court finds that ███████ testimony is credible in this regard.

reported 2003 statement that although he heard of others being tortured while in Pakistani

custody, he himself had never been tortured. (REX 91 at 2; REX 101 at 1.) While this 2003

statement was made prior to Anam's recantation, it remains noteworthy precisely because he was

comfortable enough under the circumstances to attribute coercive tactics to the Pakistanis, and

yet he disavowed that such methods had been used on him. Also, in Anam's *habeas* proceedings

before Judge Hogan, the Court denied his request for discovery regarding abuse by foreign

captors because, *inter alia*, he only presented evidence of abuse while in American custody and

"provide[d] no documents or declarations that he suffered abuse while in the hands of Pakistani

authorities." Order at 5 ¶ 4, *Anam v. Obama*, No. 04-CV-1194 (D.D.C. Sept. 9, 2009) (Dkt.

651). For these reasons, the Court finds that Anam's 2005 statement is not helpful to petitioner.

Al-Qurashi also claimed that al-Swidhi (ISN 578) was tortured to the point of being

unable to walk, such that "[e]ven after [they] were transferred to Kandahar, [al-Swidhi's] foot

was swollen and he still could not walk." (Pet. Decl. ¶ 22.) In 2004, al-Swidhi was reported as

having recanted his statements about attending al-Farouq, claiming that he had been tortured into

making false statements. (REX 97 at 1; REX 98 at 2; *see also* REX 96 at 1 ¶ 2 (describing

"harsh" treatment and fear of being killed); REX 102 at 2 (same).) Although petitioner does not

clarify whether al-Swidhi was purportedly beaten before or after his interview with ████, it is

logical to infer that if the Pakistanis had been trying to coerce arrestees into giving false

information to the Americans, they would engage in such coercion prior to ████ interviews.



Ye████ ████████ ████████ ████████ (*See* ████ EC at 28-30.) ████████ ████████ (*id.* at 35), one would expect ████ to have noted a similar fact with

47

SECRET – CLASSIFIED

respect to al-Swidhi.

Al-Qurashi also allegedly heard screams from someone he believed to be Bin Amer (ISN 564), who looked "beaten up" after his interrogations. (Pet. Decl. ¶ 21.) In 2006, interrogators reported that Bin Amer recanted his statements about training at a Libyan camp near Kabul, claiming that he had been tortured and/or threatened with torture by the Pakistanis. (*See* REX 93; REX 92; PEX 73.) If true, this would corroborate what petitioner saw and, in turn, petitioner's allegations. However, Bin Amer's statement regarding abuse is undermined by the fact that in his *habeas* proceedings before Judge Hogan, the Court denied without prejudice his request for discovery regarding abuse by foreign captors, because he "fail[ed] to demonstrate with sufficient specificity and evidence," *inter alia*, "that he suffered from abuse by Pakistani authorities . . . ." Order at 3 ¶ 6, *Bin Amer v. Obama*, No. 04-CV-1194 (D.D.C. Sept. 9, 2009) (Dkt. 650) (permitting renewal of discovery request if he "can document evidence of such abuse"). In addition, sometime in January 2010, in an apparent effort to document abuse as permitted by Judge Hogan, Bin Amer wrote a letter to his attorney in which he stated that while in detention, he "could hear [petitioner] scream while he was in a different cell" due to "torture." (PEX 72 at 2.) The letter further stated that when Bin Amer saw petitioner again, petitioner explained that "he was subject to[] beating, desecration[,] and all kinds of humiliations." (*Id.*) Assuming the accuracy of the translation, this letter is curious since petitioner has never alleged that the Pakistanis engaged in "desecration."[33]

---

[33] Typically, "desecration" describes religiously charged acts, which seems implausible here since the Pakistani authorities were almost certainly the same religion as petitioner. *See* CIA – The World Factbook – Pakistan, *at* http://www.cia.gov/library/publications/the-world-factbook/geos/pk.html (last visited Aug. 2, 2010) (stating that 95% of Pakistanis are Muslim).

48

~~SECRET – CLASSIFIED~~

Finally, according to a government risk assessment document, al-Azani (ISN 575) recanted in 2004 by claiming "torture by his original captors." (REX 103 at 1¶ 3; *see also* REX 104.) Nothing else in the record of this case or the publicly accessible record of al-Azani's *habeas* proceedings either bolsters or undermines the reliability of this report, and thus, the Court is unable to accord the document any real weight.

### 3. Abusive practices of the Pakistani authorities

The Court acknowledges that there is evidence regarding the custodial abuse of suspects by Pakistani authorities and officials. (*See* PEX 32 at 3, 6 (U.S. Department of State Country Report on 2002 human rights practices); PEX 31 at 6-8 ¶ 5.1, 10 ¶ 5.3 (Amnesty International report describing torture of terrorism suspects by Pakistani security, military, and intelligence agents); PEX 18 ¶ 10 (ISN 257's allegation of abuse by Pakistani intelligence services in late 2001); PEX 19 ¶ 1 (same); PEX S ¶ 7 (ISN 839's allegation of abuse by Pakistani intelligence officer in late 2002); *see also* PEX 33 at 2 ¶ 162 (Pakistani criminal procedure code section generally prohibiting use at trial of custodial statements to police); PEX 34 at 1 ¶ 39 (Pakistani executive order prohibiting use of suspect's custodial confession against him unless made in magistrate's presence).) However, the Court cannot infer from the Pakistani authorities' general reputation that petitioner was necessarily abused on February 7 and 8, 2002. ████████

████████████████

████ From this, it can be inferred that the Pakistani authorities were aware that U.S. officials might interview the other suspects. Because of this expectation, because ████ likely saw the suspects upon their arrest████████████████████

████████ the Pakistanis would have a strong disincentive to beat suspects in a way that might

49

~~SECRET—CLASSIFIED~~

be observed by the American interrogators. This disincentive is consistent with the fact that

Hamdoun (ISN 576) disavowed being tortured by the Pakistanis (*see* PEX 15 ¶ 8) and that al-

Hajj (ISN 1457) and al-Zamel (ISN 568) alleged only that they were abused in American

custody and said nothing about their Pakistani captors. (*See* PEX 23 at 1 ¶ 1; PEX 80 ¶ 3; PEX

16 ¶¶ 6-7.)

### D.   Conclusion

Based on the totality of the circumstances surrounding al-Qurashi's[2] ████████████

statements to Agent ████ the Court concludes that respondents have sustained their burden to

show that these incriminating statements were made voluntarily and are therefore admissible.

*See United States v. Abu Ali*, 395 F. Supp. 2d 338, 378 (E.D. Va. 2005) (declining to suppress

statements in criminal prosecution). Accordingly, the Court will consider petitioner's statement

to Agent ████ in Pakistan[2] ████████████████ and it will deny his motion to suppress.

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that petitioner's motion to suppress is

denied. Counsel are directed to contact chambers within the week to schedule a conference call.

**SO ORDERED.**

*E/la S Huvel*

ELLEN SEGAL HUVELLE
United States District Judge

Date: August 3, 2010

50